UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FARBOD AMINI and LAMAN AMINI, husband and wife,<br><br>               Plaintiffs,<br><br>     v.<br><br>CRESTBROOK INSURANCE COMPANY and NATIONWIDE INSURANCE COMPANY OF AMERICA,<br><br>               Defendants. | CASE NO. C21-1377-KKE<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT |

      In August 2020, an intoxicated driver skidded onto the driveway of Farbod and Laman Amini's Camano Island home. This dispute arises from the Aminis' subsequent attempt to claim insurance funds from Defendants Crestwood Insurance Company and Nationwide Insurance Company of America in order to repair their concrete driveway. Before the Court is the Aminis'

1  Motion for Partial Summary Judgment. Dkt. No. 32. For the reasons discussed herein, the Court

2  denies the Aminis' motion.[1]

## I.    BACKGROUND

**A.    Factual Background**

### 1.    An Intoxicated Driver Crashes Onto the Aminis' Property

The Aminis own and live at their home in Camano Island, Washington. Dkt. No. 34 at 1.
On August 12, 2020, a drunk driver crashed onto the Aminis' property, damaging their "stamped
finish colored concrete driveway." *Id.*; *see also* Dkt. No. 44-2 at 3–8 (photographs of the scene);
Dkt. No. 44-3 (same). The incident also damaged two cars parked in the Aminis' driveway. Dkt.
No. 38-6 at 2; Dkt. No. 40-1 at 14.

### 2.    The Aminis File an Insurance Claim

Prior to the accident, in March 2020, the Aminis purchased a homeowner's insurance
policy issued by Defendant Nationwide Insurance Company of America and underwritten by
Defendant Crestbrook Insurance Company, which provided policy coverage for the period
between March 23, 2020 and March 23, 2021. Dkt. No. 38-8 at 3–5.[2] On September 9, 2020, after
unsuccessfully attempting to file a claim through the at-fault driver's insurance policy, Mr. Amini
filed a claim under his homeowner's policy regarding the August 12 incident. Dkt. No. 34 at 2;
*see also* Dkt. No. 32 at 2; Dkt. No. 38-6 at 2. The same day, the claim was assigned to field claims
specialist Stuart Copeland, who reached out by telephone to Mr. Amini. *See* Dkt. No. 34 at 2; Dkt.
No. 38-6 at 2; Dkt. No. 40-1 at 14–15; Dkt. No. 44-2 at 2. During their conversation, Mr. Amini
represented that the accident had "caused significant damage to [his] concrete driveway,"

---

[1] Because the Court can decide the motion on the parties' filings, it denies the Aminis' request for oral argument. Dkt. No. 32 at 1.

[2] The Court refers to Defendants collectively herein as "Crestbrook." *See* Dkt. No. 37 at 1.

1   including "numerous gouges[ and] scrapes[.]" Dkt. No. 33-1 at 2. Mr. Amini also stated that "most

2   of the concrete driveway will have to be repaired manually" and that "the entire surface will need

3   to be repaired [for] matching purposes," which could cost up to $80,000. *Id.*

4          Notably, Mr. Amini owns and operates a construction company called "Expert

5   Construction Service, LLC," and his company served as the general contractor for the driveway's

6   original installation in May 2017. Dkt. No. 34 at 1–2; *see also id.* at 2 (Mr. Amini's declaration

7   stating that "[he] was very involved in the concrete work that was done at that time" and "had done

8   many concrete jobs in [his] construction work career."); Dkt. No. 38-4 at 4 (Mr. Amini describing

9   his involvement in driveway construction). Indeed, Mr. Amini handpicked the light brown

10  "Canvas" color pigment for the driveway. Dkt. No. 34 at 1–2. The Aminis' expert explains that

11  the driveway was made by (1) pouring 39.1 cubic yards of integral, canvas colored concrete,

12  (2) stamping a pattern into the surface of the concrete once it "had time to setup," (3) adding an

13  enhancement color of Perma-Tique antiquing agent after the concrete hardened, which "accent[ed]

14  the undulations of the stamped pattern with a more visual depth," and (4) applying a solvent-based

15  sealer. Dkt. No. 38-7 at 3; *see also* Dkt. No. 38-4 at 5–7 (additional information about the process

16  of pouring, stamping, and finishing the driveway).

17         On September 10, 2020, the day after their first phone call, Mr. Amini sent a follow-up

18  email to Copeland attaching, among other things, photographs of the driveway and estimates

19  totaling $87,650.25 for the costs of "repair[ing] and replac[ing]" the driveway. Dkt. No. 38-6 at

20  2–12.[3] Copeland called Mr. Amini the next day and represented that Crestbrook had reviewed his

21

22

23

24

---

[3] Of this initial total estimate, $2,304.44 was based on an invoice from Mr. Amini's company, which had done some clean up following the accident. *Id.* at 3; *see also* Dkt. No. 40-1 at 6. The remaining total was based on estimates from Cascade Concrete Sawing & Drilling for $39,186.35, Dkt. No. 38-6 at 4, and from Alpha Concrete Designs, LLC for $46,159.46, *id.* at 7. By July 12, 2021, when Mr. Amini provided notice to Crestbrook of his intent to sue, his estimate for the necessary repair work had grown to $147,589.25. Dkt. No. 44-4 at 40.

ORDER DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT - 3

1    estimate and felt that "the scope of repair appear[ed] very high, given the amount of damage

2    observed in the pictures." Dkt. No. 33-5 at 24. Copeland conveyed that Crestbrook would be

3    "reaching out to alternate contractors to secure estimates/sub bids," and Copeland's notes from the

4    call indicate that Mr. Amini "understood." *Id.* The two agreed to "speak again" the following week.

5    *Id.*

6           After first leaving a voicemail, Copeland reached Mr. Amini again by telephone on

7    September 16, 2020, and they further discussed the driveway claim. Dkt. No. 40-1 at 11–12.

8    Copeland advised Mr. Amini that an alternate vendor would be reaching out to see about cleaning

9    and resealing his driveway, as opposed to fully replacing it, and Mr. Amini expressed that he did

10   not think that plan would work, but "agreed to allow [an] alternate vendor to inspect" and attempt

11   to clean the driveway. *Id.* at 11.

12         3.    Copeland Coordinates A Driveway Inspection

13          In the meantime, Copeland's colleague, Tom Russell, had reached out to Dave Bingham,

14   the superintendent of Saber Construction, about going to the Aminis' property and removing the

15   tire marks from the driveway. Dkt. No. 33-1 at 10, 12–13; Dkt. No. 39-1 at 5. Jay Olsen, the owner

16   of Saber Construction, also owned a ServiceMaster franchise which performed cleanings of all

17   types, and the record appears to indicate that Bingham first engaged ServiceMaster regarding the

18   Aminis' claim. *See* Dkt. No. 38-2 at 23; Dkt. No. 39-1 at 5 & n.3. On September 18, 2020, Bingham

19   emailed Mr. Amini:

20         Hi Farbod,

21         My name is Dave Bingham with Saber Construction. Stuart Copeland with
           Nationwide Insurance reached out to us to see if we could help with the driveway

22         damages at your home. We would like to come out next week and take a closer look
           at the issues and try a couple of solutions. Nobody needs to be home. Let me know

23         if that's ok with you and we'll schedule a day to come out. Thanks, and have a good
           weekend.

24

1    Dkt. No. 40-2 at 2.

2            On September 29, 2020, however, Bingham forwarded an email to Copeland concerning a

3    September 22 conversation between Jay Olsen and Mr. Amini. Dkt. No. 33-1 at 23, 112; Dkt. No.

4    39-1 at 5. Saber Construction's Operations Manager Julie Norton had sent the original email to

5    Tom Russell, and Bingham commented to Copeland that it sounded like a "challenging situation"

6    and apologized that "we couldn't help you out with this one." Dkt. No. 33-1 at 112; Dkt. No. 40-

7    3 at 2. The September 22 email stated:

8            Hi Tom, Jay [Olsen] just had a 1/2 hour conversation with Mr[.] Amini, [i]t doesn't
             look like we are going to be able to help you. The homeowner said he is on Tribal
9            Land and they are super strict about chemicals and[/]or equipment used on the
             property. Also it[']s on the septic drain field, therefore we can not [sic] use any
10           harsh chemicals to try to get the tire marks out-[-]Green products only. Also, the
             home owner is a concrete contractor and knows more about concrete th[a]n anyone
11           we've ever met. The driveway is not stained[,] it[']s colored concrete, [so] if
             someone tries to remove the tire tread marks and the color comes out[, ]there is no
12           way to re-stain it. Then he went on and on about the sealant coat-[-]same thing, no
             way to seal a patch and have it match. I think maybe you need a concrete company?

13   Dkt. No. 33-1 at 112–13; Dkt. No. 40-3 at 2–3.

14           On September 29, 2020, prior to receiving Bingham's email stating that Saber Construction

15   and/or ServiceMaster would not be able to assist on the claim, Copeland emailed and left a

16   voicemail for Mr. Amini inquiring about the status of Bingham's forthcoming visit to the property.

17   Dkt. No. 40-1 at 10; Dkt. No. 40-2 at 2. Copeland also separately reached out to Bingham for an

18   update. Dkt. No. 40-4 at 3. On September 30, 2020, Copeland called Bingham and Bingham

19   expressed that "he would be happy to do a test clean[] and prepare [an] estimate but [Mr. Amini]

20   was resistant to this." Dkt. No. 40-1 at 9. Copeland then confirmed in writing that Bingham was

21   authorized to inspect the Aminis' driveway and report back, and Bingham emailed Mr. Amini

22   informing him of his upcoming visit. Dkt. No. 44-1 at 22. The same day, Copeland called Mr.

23

24

1    Amini and discussed next steps, and his notes show that Mr. Amini understood that Crestbrook

2    needed to inspect the driveway and would work with a general contractor. Dkt. No. 40-1 at 8.

3          The record is unclear how it came to be that Bingham ultimately agreed to inspect the

4    Aminis' driveway following Saber Construction's indication that it could not help out. Dkt. No.

5    33-1 at 112. Copeland testified at deposition that Bingham was "originally assigned by Tom

6    [Russell]" and that they had both worked with him in the past and were happy to approve him to

7    remove the skid marks from the Aminis' driveway if he was able. Dkt. No. 38-2 at 22. In addition,

8    Copeland testified that in the fall of 2020, there were restrictions on field inspections due to the

9    COVID-19 pandemic which prevented him from personally visiting the property, and that in any

10   event, Crestbrook needed a general contractor to go to the Aminis property "to conduct a test clean

11   to determine if it was possible that the rubber scuff from the tires could be removed from the

12   concrete," a task he was not equipped to complete. Dkt. No. 38-2 at 18–19; *but see* Dkt. No. 38-5

13   at 9 (Deposition of Stephen Strzelec indicating that he could not recall a policy precluding claim

14   representatives from leaving the office).

15         Although Copeland was uncertain about the extent of Bingham's knowledge of concrete

16   and had not conducted "a lot" of claims with him up until that point, he had "seen [Bingham's]

17   name on files over a several-year period" and knew that he was an "experienced contractor." Dkt.

18   No. 33-1 at 13–14; *see also id.* at 41–42 (Copeland's deposition testimony regarding his

19   knowledge of Bingham's experience as a contractor); Dkt. No. 38-2 at 24–25 (same). Copeland

20   viewed the situation as "a very simple claim" with a "rubber scuff mark on a concrete driveway"

21   and felt that "it was well within Mr. Bingham's skill set to at least provide direction on the

22   feasibility of repair[.]" Dkt. No. 33-1 at 15–16. Bingham testified at deposition that he had been

23   superintendent at Saber Construction for nearly a decade and had done some small concrete jobs

24

1    himself, including resealing and cleaning stamped finished concrete, and had subcontracted out

2    other concrete projects. Dkt. No. 38-3 at 4–6, 15.

3            4.   Bingham Visits the Aminis' Property and Does a Test Clean

4            On October 2, 2020, Bingham visited the Aminis' home with a "selection of cleaning

5    products" to test if the skid marks could be removed by cleaning the driveway. Dkt. No. 33-5 at

6    26; *see also* Dkt. No. 38-3 at 11–13, 18. In preparation for the visit, Bingham consulted with Olsen,

7    who had cleaned concrete "many times." Dkt. No. 38-3 at 15. Mr. Amini attests that he told

8    Copeland prior to Bingham's visit that he "did not believe the driveway could simply be cleaned,

9    but required a more involved repair that required hiring concrete contractors." Dkt. No. 34 at 2;

10   *see also* Dkt. No. 33-1 at 17–18; Dkt. No. 38-2 at 29; Dkt. No. 38-4 at 12. Though skeptical, Mr.

11   Amini did not object to Bingham coming to his property and attempting to clean the skid marks,

12   and was present for the October 2 visit. Dkt. No. 38-4 at 12, 14.

13           To conduct the test clean, Bingham taped off a 12-inch-by-12-inch square, "sprayed a little

14   bit of Simple Green[4] on the area and lightly scrubbed . . . for probably [three] minutes." Dkt. No.

15   33-5 at 26 (footnote added); *see also id.* at 16 (photograph depicting taped-off treatment area);

16   Dkt. No. 34 at 3, 6; Dkt. No. 38-3 at 14–15, 22. While on the property, Bingham also measured

17   the entire concrete area in the front and back yard. Dkt. No. 33-5 at 26. After the visit, Bingham

18   informed Copeland that he "was able to easily remove the skid mark in the sample spot," as shown

19   in the photograph he took. *Id.*; *see id.* at 18 (photograph); Dkt. No. 34 at 8 (same); Dkt. No. 33-1

20   at 88. In addition, Bingham wrote that Mr. Amini was "making way to[o] big of a deal out of this.

21   He is claiming the driveway will need to be re-sealed, and it will never look right, [and] therefore

22

23   _____

     [4] Simple Green is an off-the-shelf, "mild" and "safe" liquid cleaning agent, which Bingham had used before on his

24   own patio. Dkt. No. 38-2 at 42, 49; *see also id.* at 32; Dkt. No. 33-1 at 83; Dkt. No. 38-3 at 15; Dkt. No. 39-1 at 10 &
     n.10.

1    it has to be removed and replaced." Dkt. No. 33-5 at 26 ("He is claiming there are scratches in the

2    area by the road where the skid marks start. I don't think there are, and the driveway is cracking

3    badly in that area anyways."); *see also* Dkt. No. 38-3 at 18 (Bingham's deposition testimony that

4    he was looking for scratches but "didn't see any scratches on the driveway."); *id.* at 24–25 (same).

5    Bingham expressed uncertainty whether the driveway would even need to be resealed given that

6    the sealer was "already coming off in random areas which makes for a patchy appearance as it

7    [wa]s." Dkt. No. 33-5 at 26. He told Copeland to "[t]ake a look at the pictures" and let him know

8    what he thought. *Id.*

9         Mr. Amini avers that in the days following Bingham's visit, he "observed that the concrete

10   square that Mr. Bingham had sprayed and scrubbed had become discolored. The color of the

11   concrete there was significantly lighter than the rest of the concrete." Dkt. No. 34 at 3; *see id.* at

12   10 (photograph depicting alleged discoloration). Mr. Amini states that he called Copeland days

13   after the visit and informed him about the discoloration but that Copeland "took no action in

14   response to this information and provided no plan or proposal about what to do[.]" *Id.* at 3; Dkt.

15   No. 45 at 5 (phone records showing two calls between Mr. Amini and Copeland's telephone

16   number on October 6, 2020 totaling five minutes). He contends that he "again informed Mr.

17   Copeland that [he] believed the damage to the concrete could not just be cleaned away, but required

18   more extensive repair work that included removing some of the concrete at the property and

19   repouring a new driveway, especially since Mr. Bingham had discolored the concrete test patch."

20   Dkt. No. 34 at 3. Copeland apparently disagreed. *Id.* Crestbrook avers that the claim file "contains

21   no evidence that the Aminis notified Crestbrook before [July 2021] that the test clean performed

22   by David Bingham on October 2, 2020 caused discoloration." Dkt. No. 40 at 2. And Copeland

23   testified at deposition that the test square was "just to demonstrate that that cleaning method could

24   be utilized appropriately," and that once "all of the repairs are complete and all of the cleaning is

1   done, it wouldn't look like that. The whole driveway would look more uniform." Dkt. No. 38-2 at

2   54–55; *see also* Dkt. No. 33-1 at 41.

3       5.   Copeland Issues Payment to the Aminis

4       On October 5, 2020, Bingham sent Copeland a "rough" Xactimate[5] estimate totaling

5   $3,590.35 for the costs of removing the skid marks and resealing the driveway. Dkt. No. 33-5 at

6   4–8; Dkt. No. 38-3 at 20; Dkt. No. 40-4 at 2. Bingham also noted that he did not think the driveway

7   would need to be resealed, but that "[e]ither way, [Mr. Amini] isn't going to be happy with any

8   cleaning/sealing, and anyone who tries is pretty much set up for failure." Dkt. No. 40-4 at 2. Based

9   on Bingham's work, Copeland conveyed a $4,072.92 estimate to the Aminis on October 13, 2020,

10  which was intended to cover the costs of cleaning and resealing the surface of the driveway—as

11  opposed to replacing it in its entirety—and also included additional labor costs for the initial

12  cleaning that Mr. Amini's company had done. Dkt. No. 33-1 at 30; Dkt. No. 33-5 at 10–14; *see*

13  *also id.* at 20; Dkt. No. 40-1 at 3, 5; *id.* at 7 (Copeland's notes in claim file from October 7, 2020,

14  stating that: "Successful clean performed using cleaning agent. Re-seal of driveway for color

15  matching. [Mr. Amini] noted he felt entire concrete was dyed, but picture report sho[w]s ends of

16  concrete still grey/original state."). Copeland's cover letter to Mr. Amini also stated: "If you

17  discover any additional damage to your property, please immediately contact me, either personally

18  or through your contractor/vendor. We may need to re-inspect your property before authorization

19  of supplemental payment." Dkt. No. 33-5 at 11. Copeland's notes show that he discussed this

20  estimate with Mr. Amini and communicated that Crestwood would "only cover reasonable clean

21  up costs[.]" Dkt. No. 40-1 at 3.

22

23  [5] Xactimate is an insurance claims estimating software. *See* https://www.verisk.com/insurance/products/xactimate/ (last accessed July 13, 2023); *Nikfard v. State Farm Fire & Cas. Co.*, No. C19-6001-RSL, 2021 WL 966541, at *1 n.3, *2 n.5 (W.D. Wash. Mar. 15, 2021).

24

After subtracting the Aminis' $2,500 deductible under the policy, Crestwood issued an initial payment to the Aminis of $1,572.92, but Copeland added that Crestwood would "begin the subrogation process to recover [the] deductible[.]" Dkt. No. 33-5 at 14, 20; *see also* Dkt. No. 34 at 3; Dkt. No. 40-1 at 4. Copeland and Mr. Amini did not communicate directly again. Dkt. No. 34 at 3–4; Dkt. No. 38-2 at 16. On October 23, 2020, the Aminis' counsel emailed Copeland asking if Mr. Amini could "negotiate the $1,572.92 check[] without prejudice to any remaining claims" he may have against Crestbrook, to which Nationwide responded in the affirmative. Dkt. No. 40-5 at 3; Dkt. No. 44-4 at 32–33.

6. Crestwood Recovers the Aminis' Deductible and Mr. Amini Pursues Additional Claims for Driveway Repair

Crestwood's subrogation efforts successfully recovered $4,072.92 from the at-fault driver's policy in January 2021, and the Aminis received a $2,500 reimbursement for their policy deductible in February 2021. Dkt. No. 33-1 at 108–10; Dkt. No. 34 at 4. On February 5, 2021, Stephanie Devers, a claims specialist at Nationwide, emailed Copeland asking him to contact Mr. Amini to let him know that "any property damages need to be addressed with [Copeland]" and to also "find out if there are out of pocket expenses" because Mr. Amini had apparently been contacting the driver's claim adjuster regarding "additional damages to his driveway." Dkt. No. 33-5 at 22. Copeland could not recall contacting Mr. Amini in response to Devers' request. Dkt. No. 38-2 at 56.

On July 12, 2021, the Aminis sent Defendants and the Washington State Insurance Commissioner written notice of their intent to sue. Dkt. No. 44-4 at 37–42; *see* Wash. Rev. Code § 48.30.015(8)(a). In May 2022, the Aminis reached a settlement with the at-fault driver for $57,509.19. Dkt. No. 33 at 4. A December 19, 2022 report prepared by the Aminis' construction

1  defects expert, James Platt, estimates that the total cost of repairing and replacing the driveway is

2  more than $300,000. Dkt. No. 38-7 at 2, 4; Dkt. No. 44-4 at 10.

3  **B.      Procedural Background**

4          The Aminis initiated this lawsuit on August 10, 2021 in Island County Superior Court,

5  alleging causes of action for breach of contract, bad faith, violations of Washington's Insurance

6  Fair Conduct Act ("IFCA"), Wash. Rev. Code § 48.30 *et seq.*, and violations of Washington's

7  Consumer Protection Act ("CPA"), Wash. Rev. Code § 19.86, *et seq.* Dkt. No. 1-2 at 6–11.

8  Crestbrook removed the action to federal district court on October 8, 2021, and in March 2023,

9  the Aminis moved for partial summary judgment. Dkt. Nos. 1, 32. Specifically, the Aminis seek

10 to establish liability on their IFCA claim, bad faith claim, and elements of their CPA claim, while

11 reserving any finding on damages for a jury trial. Dkt. No. 32 at 1–2.

12                                **II.      DISCUSSION**

13 **A.      Jurisdiction**

14         Federal courts "have an independent obligation to determine whether subject-matter

15 jurisdiction exists[.]" *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006). Defendants invoked the

16 Court's diversity jurisdiction as the basis for removal in this case. Dkt. No. 1 at 2; *see* 28 U.S.C.

17 § 1441(a). Diversity jurisdiction exists over all civil actions where the matter in controversy

18 exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a)(1). The

19 Ninth Circuit, however, strictly construes the removal statute against removal jurisdiction. *See*

20 *Hansen v. Grp. Health Coop.*, 902 F.3d 1051, 1056 (9th Cir. 2018). "The strong presumption

21 against removal jurisdiction means that the defendant always has the burden of establishing that

22 removal is proper." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam) (quotation

23 marks omitted).

24

1    Defendants have met that burden even though the Aminis' complaint does not allege a

2    specific amount of damages. *See generally* Dkt. No. 1-1. As Defendants note, the Aminis seek to

3    recover at least $140,000 in contractual damages, treble damages up to $25,000 under the CPA,

4    treble damages under IFCA, and attorney fees and costs. Dkt. No. 1 at 3; *see* Dkt. No. 1-2 at 7, 11.

5    Furthermore, the parties are citizens of different states: the Aminis are citizens of Washington, and

6    Crestbrook and Nationwide are Ohio corporations with their principal places of business in Ohio.

7    Dkt. No. 1 at 2–3; Dkt. No. 1-2 at 1. Therefore, this Court has jurisdiction under 28 U.S.C. § 1332.

8    **B.    Summary Judgment Standard**

9    Summary judgment is appropriate only when "the movant shows that there is no genuine

10   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

11   Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

12   stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

13   evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

14   sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

15   resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

16   the facts specifically averred by that party contradict facts specifically averred by the movant, the

17   motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

18   The Court will, however, enter summary judgment "against a party who fails to make a

19   showing sufficient to establish the existence of an element essential to that party's case, and on

20   which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

21   (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must

22   come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

23   *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis, internal quotation,

24

1   and citation omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific

2   allegations, *Lujan*, 497 U.S. at 888–89.

3   **C.      The Aminis' IFCA Claim**

4           Under IFCA, a "first party claimant to a policy of insurance who is unreasonably denied a

5   claim for coverage or payment of benefits by an insurer may bring an action . . . to recover the

6   actual damages sustained, together with the costs of the action, including reasonable attorneys'

7   fees and litigation costs[.]" Wash. Rev. Code § 48.30.015(1); *see also Young v. Safeco Ins. Co. of*

8   *Am.*, No. 20-CV-01816-LK, 2022 WL 4017893, at *7 (W.D. Wash. Sept. 2, 2022) (explaining that

9   "IFCA creates two circumstances under which an insurer may be liable: when it unreasonably

10  denies a claim for coverage or when it unreasonably denies a payment of benefits"). In addition,

11  IFCA provides a list of Washington Administrative Code violations that, although not a basis for

12  an independent cause of action, give rise to treble damages or to an award of attorney's fees and

13  costs under the statute. Wash. Rev. Code § 48.30.015(2)–(3), (5); *see Perez-Crisantos v. State*

14  *Farm Fire & Cas. Co.*, 389 P.3d 476, 482–83 (Wash. 2017).

15          As relevant here, the Aminis move for summary judgment on their claims that Crestbrook

16  unreasonably denied a payment of benefits in violation of Section 48.30.015(1) and also violated

17  four regulations enumerated in Section 48.30.015(5). Dkt. No. 32 at 1–2, 10–20 (citing Wash.

18  Admin. Code §§ 284-30-330(4), (6), (13), and 284-30-370). For the reasons discussed below, the

19  Court finds that genuine disputes of material fact preclude granting summary judgment in favor of

20  the Aminis on these aspects of their IFCA claim.

21          1.  Section 48.30.015(1)

22          As noted above, the Aminis must "allege the trigger for an IFCA suit—an unreasonable

23  denial of a claim for coverage or payment of benefits." *Taladay v. Metro. Grp. Prop. & Cas. Ins.*

24  *Co.*, No. C14-1290-JPD, 2016 WL 3681469, at *2 (W.D. Wash. July 6, 2016) (cleaned up). The

Aminis argue that "Crestbrook's refusal to pay anything more than $4,072.92 before this action was filed was a denial of the 'payment of benefits' prong of [Section] 48.30.015(1) and supports the determination that Crestbrook violated the IFCA as a matter of law." Dkt. No. 32 at 10.

The Court's analysis here "focuses primarily on what [Crestbrook] knew and/or should have known at the time the [$4,072.92] offer was made to determine whether the proffered payment effectively denied [the Aminis] the benefits of the insurance policy." *Morella v. Safeco Ins. Co. of Ill.*, No. C12-0672-RSL, 2013 WL 1562032, at *4 (W.D. Wash. Apr. 12, 2013); *see also Heide v. State Farm Mut. Auto. Ins. Co.*, 261 F. Supp. 3d 1104, 1107–08 (W.D. Wash. 2017); *Jelinek v. Am. Nat'l Prop. & Cas. Co.*, No. C15-779-RAJ, 2016 WL 11782834, at *5 (W.D. Wash. Sept. 22, 2016). Courts in this district have found that the benefits of a policy are effectively denied when an insurer "pays or offers to pay a paltry amount" that (1) is not in line with the losses claimed, (2) is not based on a reasoned evaluation of the facts, and (3) would not compensate the insured for the loss at issue. *Morella*, 2013 WL 1562032, at *3. If, however, an insurer "makes a reasonable payment based on the known facts or is making a good faith effort to appropriately value the loss, the fact that the insured did not immediately get all of the benefits to which it may ultimately be entitled does not establish an 'unreasonable denial[.]'" *Id.* In other words, "the key question" is whether Crestbrook's handling of the Aminis' "insurance claim was so deficient that it rises to the level of an 'unreasonable denial of payment of benefits[.]'" *Naxos, LLC v. Am. Fam. Ins. Co.*, No. C18-1287-JLR, 2020 WL 777260, at *23 (W.D. Wash. Feb. 18, 2020) (quoting Wash. Rev. Code § 48.30.015(1)).

Notwithstanding the Aminis' dissatisfaction with Crestbrook's initial payment, whether that amount was in line with the losses claimed (skid marks and scrapes to the driveway), based on a reasoned evaluation of the facts (Bingham's site visit and test clean), and constituted

compensation for the loss at issue (driveway damage), is a determination best left for the jury. This is so for several reasons.

First, there is a dispute of fact with respect to whether the August 12 accident caused some of the claimed scrapes and gouges on the Aminis' driveway. The Aminis admit they have no photographs showing the condition of the driveway between May 2017 and August 12, 2020, and that the driveway experienced "wear and tear" during that span, but deny that the driveway had cracked in places prior to August 12, 2020. Dkt. No. 38-1 at 3–4; *see also* Dkt. No. 33-3 at 7 (Kip Gatto investigation report); Dkt. No. 33-5 at 26 (October 2, 2020 Bingham email to Copeland following his visit and test clean); Dkt. No. 38-3 at 18 (Bingham's deposition testimony that he "didn't see any scratches on the driveway"); *id.* at 24–25 (Bingham testifying about scratch marks versus skid marks on driveway); Dkt. No. 41 at 2 (Gatto declaration stating that "not all of the surface abrasions [the Aminis] identify are caused by the drunk driver incident.").[6] Second, though it is undisputed that Bingham's test clean resulted in discoloration of the test square, the Court cannot find as a matter of law that it was unreasonable to attempt the test clean. The Aminis make much of their property sitting within a "Shoreline jurisdiction" and implicating issues with respect to Tribal Lands, but fail to show that Bingham's use of Simple Green violated any local ordinances or rules. *See, e.g.*, Dkt. No. 32 at 13; Dkt. No. 33-1 at 36–38. Third, though the Aminis maintain that Mr. Amini put Copeland and Bingham on notice that Bingham's cleaning test resulted in discoloration, and the record shows that Mr. Amini and Copeland spoke briefly by phone on

---

[6] On reply, the Aminis argue that "[t]he Court should disregard Mr. Gatto's opinions concerning the proper scope of the necessary driveway repairs" because his declaration fails to include testimony regarding his knowledge or experience in residential concrete driveway construction or repair. Dkt. No. 47 at 12. Confusingly, the Aminis submit and cite to the same expert's opinions in support of, among other things, their assertion that Crestbrook undervalued their claim for the cost of necessary driveway repairs. Dkt. No. 32 at 10, 16 (citing to "Beckett Decl., Ex. 8," which spans Dkt. No. 33-2 at 1–13; Dkt. No. 33-3 at 1–10; Dkt. No. 33-4 at 1–20). In any event, the Court finds that this expert is qualified for the purposes of the instant motion. *See* Dkt. No. 33-4 at 5–12.

October 6, Crestbrook disputes that Mr. Amini complained about the test clean prior to informing it of their intent to sue. *See* Dkt. No. 34 at 3; Dkt. No. 45 at 5; Dkt. No. 40 at 2. Fourth, whether Crestbrook's $4,072.92 payment would have covered the costs of cleaning and resealing the driveway—or whether cleaning and resealing the driveway would have adequately compensated the Aminis for the damage to their property—is a factual dispute. *Compare*, *e.g.*, Dkt. No. 37 at 10, *with*, Dkt. No. 32 at 4–5; *see also* Dkt. No. 33-1 at 54–55. And fifth, Crestbrook's $4,072.92 payment did not necessarily represent the end of the line; Copeland's cover letter stated that if the Aminis discovered any additional damage to their property, "authorization of supplemental payment" was an option. Dkt. No. 33-5 at 11.

It is, of course, possible that a jury will agree Crestbrook's $4,072.92 payment to the Aminis in October 2020 constituted an unreasonable valuation of their claim based on the facts available at the time. But because that conclusion is not the only possible outcome a jury could reach, the Court concludes that summary judgment is inappropriate. *See Freeman v. State Farm Mut. Auto. Ins. Co.*, No. C11-761-RAJ, 2012 WL 2891167, at *3 (W.D. Wash. July 16, 2012). At bottom, the Aminis argue that Crestbrook "refus[ed] to *seriously* evaluate [their] claim[.]" Dkt. No. 32 at 10 (emphasis added). Crestbrook disputes this characterization. *See, e.g.*, Dkt. Nos. 39–39-1 (Expert declaration and report of Danette Leonhardi opining that Crestbrook acted reasonably and in good faith).[7] Thus, based on the record in this case, and resolving all inferences in Crestbrook's favor, the seriousness of Crestbrook's evaluation is to be resolved at trial. *Naxos*, 2020 WL 777260, at *23.

---

[7] The Aminis argue in passing that "[t]o the extent Danette Leonhardi recites unsupported and false representations and speculative facts to support her opinions, the Court should not consider them." Dkt. No. 47 at 14–15 (citing Fed. R. Evid. 703)). However, this general objection to Leonhardi's expert opinions is unavailing. *See, e.g.*, *Animal Legal Def. Fund v. Olympic Game Farm, Inc.*, No. 3:18-CV-06025-RSL, 2023 WL 3304264, at *4 & n.4 (W.D. Wash. May 8, 2023).

In sum, given that the Court cannot conclude as a matter of law that Crestbrook failed to make a reasonable payment based on the established facts as of October 13, 2020, the Court likewise cannot find an "unreasonable denial" just because the Aminis "did not immediately get all of the benefits to which [they] may ultimately be entitled." *Morella*, 2013 WL 1562032, at *3.

2.  Administrative Code Violations

For reasons similar to those discussed above, disputes of fact preclude granting summary judgment on the Aminis' claims under the four implicated insurance regulations. As pertinent here, the following conduct is defined "as unfair methods of competition and unfair or deceptive acts or practices of the insurer in the business of insurance, specifically applicable to the settlement of claims":

1.  Refusing to pay claims without conducting a reasonable investigation, Wash. Admin. Code § 284-30-330(4);

2.  Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear, *id.* § 284-30-330(6); and

3.  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement, *id.* § 284-330(13).

In addition, "[e]very insurer must complete its investigation of a claim within thirty days after notification of claim, unless the investigation cannot reasonably be completed within that time," and people involved in the investigation "must provide reasonable assistance to the insurer in order to facilitate compliance" with this deadline. *Id.* § 284-30-370. The Court addresses the Aminis' arguments as to each alleged violation.

*(a) Section 284-30-330(4)*

The Aminis argue that Crestbrook violated Section 284-30-330(4) by "not conducting a reasonable investigation before making its determination of the value of the [their] claim[.]" Dkt. No. 32 at 1, 11–19. "Insurers must conduct reasonable and prompt investigations, but they need not necessarily investigate every discrete element. The focus is not on what could have been done, but on what was actually done by the insurer." *Bridgham-Morrison v. Nat'l Gen. Assurance Co.*, No. C15-927-RAJ, 2016 WL 2739452, at *6 (W.D. Wash. May 11, 2016) (citation omitted), *aff'd*, 739 F. App'x 381 (9th Cir. 2018). Without weighing the evidence or making any credibility determinations, *Anderson*, 477 U.S. at 255, the Court finds that while Crestbrook "may have been able to conduct a more extensive investigation, issues of fact remain as to whether any additional investigation was reasonably necessary or warranted," *Gamble v. State Farm Mut. Auto. Ins. Co.*, No. 3:19-CV-05956-RJB, 2020 WL 5081706, at *4 (W.D. Wash. Aug. 27, 2020).

Upon Mr. Amini's filing of a claim with Crestbrook on September 9, 2020, Copeland reached out by telephone the same day, and soon after began working to coordinate a visit to the Aminis' property, culminating in Bingham's October 2, 2020 visit and Crestbrook's subsequent estimate for cleaning and resealing the driveway. *See* Dkt. No. 33-1 at 2; Dkt. No. 34 at 2; Dkt. No. 33-5 at 26; Dkt. No. 40-2 at 2. That Copeland did not accept Mr. Amini's assessment of the claim valuation out of hand is not unreasonable as a matter of law. *See Am. States Ins. Co. v. Symes of Silverdale, Inc.*, 78 P.3d 1266, 1270 (Wash. 2003) (explaining that "an insurer must give equal consideration in all matters to the policyholder's interests as well as its own." (cleaned up)); *see also* Dkt. No. 38-2 at 45–46 (Copeland's deposition testimony that "[Crestbrook] cannot take every opinion that somebody gives us and determine that . . . that opinion is a reasonable repair just because it come[s] from a client. We still have an obligation to -- to investigate and determine if that repair method proposed was a reasonable one."); Dkt. No. 39 at 2 (Leonhardi's opinion that

"[Copeland] was not required to accept Mr. Amini's position as unquestionable fact."); Dkt. No. 39-1 at 12 (same). Similarly, the Court cannot find as a matter of law that Copeland's efforts to secure a third-party contractor to inspect the driveway and assess the viability of remedies short of full driveway replacement was unreasonable, nor can it definitively say that selecting Bingham to complete this work was necessarily unsupportable. *See* Dkt. No. 39-1 at 9–10.

The Aminis take issue with both Copeland's and Bingham's respective concrete repair qualifications and emphasize what Crestbrook *could have done* during its investigation to avoid arriving at the conclusion that cleaning and resealing the driveway would be viable. *See, e.g.*, Dkt. No. 32 at 12 ("Mr. Copeland never went to the Aminis' property to inspect the damage and only observed the property and damage via photographs."); *id.* ("Mr. Copeland has no practical experience working with concrete[.]"); *id.* at 13 ("Mr. Copeland based his opinion about the efficacy of Mr. Bingham's proposed method of repairing the driveway in part upon his 'speculat[ion that what Mr. Bingham] was doing originally is seeing can the rubber compound be removed from the concrete.'"); *id.* at 15 ("Mr. Bingham had never poured or finished a stamped finish concrete project."); *id.* ("Everything Mr. Bingham has learned about construction has been through on-the-job experience.").

With the benefit of hindsight, Copeland undoubtedly could have conducted his investigation of the Aminis' claim differently. But rather than establishing that Crestbrook's investigation was unreasonable as a matter of law, these discrete elements underscore gaps in the record, disputes of material fact, and genuine issues for trial. For instance, (1) whether Copeland and/or Bingham were appropriately qualified to investigate the feasibility of removing the tire marks off the driveway, (2) whether Copeland was required to heed Mr. Amini's guidance on repairing the driveway, (3) whether using Simple Green on the test patch was reasonable, (4) why Bingham completed the site visit and test clean after Saber Construction and ServiceMaster

1    appeared to back out, and (5) whether any contractors would have cleaned and resealed the

2    driveway for the dollar amount provided by Crestbrook, are all factual questions that go to the

3    overall reasonableness of the investigation.

4        Ultimately, because a reasonable juror could weigh the evidence and decide that

5    Crestbrook's investigation was reasonable, this issue is best left for a jury to determine. *Gamble*,

6    2020 WL 5081706, at *4.

7            *(b) Section 284-30-330(6)*

8        The Aminis further contend that "by not attempting in good faith to effectuate a prompt,

9    fair, and equitable settlement of the[ir] insurance claim after liability had become reasonably

10   clear," Crestbrook violated Section 284-30-330(6). Dkt. No. 32 at 1; *see also id.* at 10 ("Here, the

11   proof is in the pudding: whereas Crestbrook offered the Aminis a total of only $4,072.92 to settle

12   their claim before they filed this lawsuit, its own expert believes the claim value is $49,147.54.").

13   However, that Crestbrook "did not pay as much or as promptly as [the Aminis] would have

14   preferred" does not establish that Crestbrook denied coverage or refused to pay the Aminis

15   amounts owed under their homeowner's policy. *Naxos*, 2020 WL 777260, at *22. And unlike in

16   *Morella*, where the insurer provided no explanation of how they generated their settlement number

17   and that number was substantially lower than the insurer's internal estimates *at the time* of

18   payment, *Morella*, 2013 WL 1562032, at *2, the record here shows that Mr. Amini was aware

19   of—albeit dissatisfied with—the basis for Crestbrook's estimate, *see* Dkt. No. 33-1 at 30; Dkt. No.

20   33-5 at 10–14, 20; Dkt. No. 40-1 at 3, 5, 7; Dkt. No. 40-4 at 2. As with the Aminis' other claims,

21   a jury may find that Crestbrook's actions violated the relevant regulatory scheme. Nevertheless,

22   based on the current record, the Court cannot find as a matter of law that Crestbrook failed to

23   attempt in good faith to reach a "prompt, fair, and equitable settlement" of the Aminis' claim.

24

1        *(c) Section 284-30-330(13)*

2        Next, the Aminis argue that Crestbrook violated Section 284-330(13) by failing to

3    promptly provide a reasonable explanation of the basis in the insurance policy for its offer of a

4    compromise settlement. Dkt. No. 32 at 1–2, 19. For the reasons just explained, this argument is

5    not supported by the record. As Crestbrook highlights, Dkt. No. 37 at 18, Copeland regularly

6    communicated with Mr. Amini both as to the status of his claim and the basis for Crestbrook's

7    respective valuation of said claim. *See, e.g.*, Dkt. No. 33-5 at 10–14, 24; Dkt. No. 34 at 2–3; Dkt.

8    No. 38-6 at 2; Dkt. No. 40-1 at 8, 10–12, 14; Dkt. No. 40-2 at 2; Dkt. No. 44-1 at 22. Accordingly,

9    because the Aminis have failed to establish the absence of a dispute of material fact, their motion

10   is denied as to this claim.

11       *(d) Section 284-30-370*

12       Last, the Aminis argue that by completing its investigation in 34 days (September 9, 2020

13   until October 13, 2020) instead of within 30 days, Crestbrook violated Section 284-30-370. Dkt.

14   No. 32 at 2, 19–20. But Section 284-70-370 provides an exception to the requirement that an

15   investigation be completed within 30 days if "the investigation cannot reasonably be completed

16   within that time," and requires the insured to "provide reasonable assistance to the insurer" to

17   comply. While there is no dispute that Crestbrook's investigation took longer than 30 days, the

18   Aminis do not respond in any way to Crestbrook's argument that its investigation could not have

19   reasonably been completed within that time frame and that Mr. Amini contributed to that delay.

20   Dkt. No. 37 at 17–18; *see generally* Dkt. Nos. 32, 47. Because a reasonable juror could find that

21   Crestbrook acted reasonably when it completed its claim investigation in 34 days, the Court denies

22   summary judgment on Crestbrook's alleged Section 284-30-370 violation. *See, e.g.*, *Allstate*

23   *Indem. Co. v. Lindquist*, No. C20-1508-JLR, 2022 WL 1607925, at *13 (W.D. Wash. May 20,

24   2022).

1    **D.    The Aminis' Bad Faith and CPA Claims**

2          The Aminis also request that the Court hold as a matter of law that by violating the

3    aforementioned insurance regulations, Crestbrook breached its duty of good faith and violated

4    three of the five elements necessary to sustain a CPA claim. Dkt. No. 32 at 20–23. In light of the

5    Court's finding that the Aminis' motion for partial summary judgment under IFCA and its

6    corresponding regulations is unwarranted, it follows that their motion should also be denied on

7    these latter claims, which are premised entirely on Crestbrook's alleged regulatory violations.

8          1.   Bad Faith

9          "To establish the tort of bad faith in the insurance context, the insured must show that the

10   insurer's actions were unreasonable, frivolous, or unfounded." *Bridgham-Morrison*, 2016 WL

11   2739452, at *4 (cleaned up); *see also Sagdai v. Travelers Home & Marine Ins. Co.*, No. 2:21-CV-

12   00182-LK, 2022 WL 16699190, at *11 (W.D. Wash. Nov. 3, 2022) ("Claims of insurer bad faith

13   are analyzed applying the same principles as any other tort: duty, breach of that duty, and damages

14   proximately caused by any breach of duty." (cleaned up)). Importantly, whether an insurer has

15   acted in bad faith is a question of fact inappropriate for disposition at summary judgment if

16   "reasonable minds could differ that the insurer's conduct was reasonable, or if there are material

17   issues of fact with respect to the reasonableness of the insurer's action[.]" *Smith v. Safeco Ins. Co.*,

18   78 P.3d 1274, 1277–78 (Wash. 2003).

19         Here, as discussed above, the Court has concluded that reasonable minds could differ as to

20   the reasonableness of Crestbrook's conduct and that there are material issues of fact with respect

21   to its actions. And while a "violation of the standards set forth in 'WACs 284–30–300 through –

22   800 . . . constitutes a breach of the insurer's duty of good faith,'" *United States Fid. & Guar. Co.*

23   *v. Ulbricht*, No. C20-0369-JLR, 2022 WL 110457, at *16 (W.D. Wash. Jan. 12, 2022) (quoting

24   *Rizzuti v. Basin Travel Serv. of Othello, Inc.*, 105 P.3d 1012, 1019 (Wash. Ct. App. 2005)), the

Aminis have failed to establish that summary judgment is appropriate as to Crestbrook's alleged violations of these standards. *See, e.g.*, *Them v. ManhattanLife Assurance Co. of Am.*, No. 3:19-CV-06034-RBL, 2020 WL 4901709, at *5 (W.D. Wash. Aug. 20, 2020) ("While the [plaintiffs] identify some inadequacies in how [the defendant] handled their claim, this is not enough to establish bad faith investigation as a matter of law."); *Heide*, 261 F. Supp. 3d at 1109 (denying insurer's motion for summary judgment on plaintiff's bad faith claim where there were disputes of material fact as to whether the insurer acted reasonably in making the settlement offer that it did). Thus, the Aminis' motion for summary judgment on their bad faith claim is denied.

2.  CPA

The elements of a CPA claim are (1) an unfair or deceptive act or practice (2) occurring in trade or commerce, (3) affecting the public interest, (4) injuring a person's business or property, and (5) caused by the defendant. *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 533 (Wash. 1986). As with a claim for bad faith, "[a] violation of an insurance regulation satisfies the first three elements of a CPA claim." *Young*, 2022 WL 4017893, at *16 (collecting cases). The Aminis seek summary judgment as to the first three elements of their CPA claim based on Crestbrook's alleged violations of the four aforementioned insurance regulations. Dkt. No. 32 at 23. Here, because the Court concludes that the Aminis have not established any such violation as a matter of law, the Court declines to enter summary judgment on the Aminis' claim regarding an unfair or deceptive act or practice, occurring in trade or commerce, and affecting the public interest. *See, e.g.*, *Young*, 2022 WL 4017893, at *16.

### III.   CONCLUSION

For the reasons stated herein, the Aminis' motion is DENIED. Dkt. No. 32. No later than October 13, 2023, the parties are directed to meet and confer and to submit a joint status report proposing amended pre-trial and trial dates.

Dated this 2nd day of October, 2023.

_____
Kymberly K. Evanson
United States District Judge